43 So.2d 471

**HENRIKSON v. HERRIN TRANSFER & WAREHOUSE CO., Inc.**

No. 39020.

Nov. 7, 1949.

Rehearing Denied Dec. 9, 1949.

Blanchard, Goldstein, Walker & O'Quin, Shreveport, for plaintiff and appellant.

Garrett & Pleasant, Shreveport, for defendant-appellee.

HAMITER, Justice.

For the destruction by fire on February 13, 1945, of her dwelling house, together with certain furnishings and household goods, plaintiff, Mrs. Pearl B. Henrikson (now wife of Clarence Ford), claims in this suit damages of $18,062.55 from Herrin Transfer & Warehouse Company, Inc., a Louisiana corporation engaged in a general trucking, hauling and storage business.

The petition charges that the fire was occasioned by the carelessness and negligence of defendant's employees while attempting to disconnect a kitchen range (from a butane system) in the course of their removing the contents of her residence with the view of storing them in the warehouse of the defendant at Shreveport.

Plaintiff sues individually and for the use and benefit of three insurers (American Central Insurance Company, Home Insurance Company and National Surety Marine Insurance Corporation) which paid portions of the above mentioned claim and were subrogated to the extent of the payments.

Defendant denies that its employees were in any manner negligent, and it avers that the fire and loss occurred solely from plaintiff's negligence. Alternatively defendant specially pleads contributory negligence on the part of plaintiff.

After trial of the merits there was judgment rejecting the demands of plaintiff. The trial judge concluded, as stated in the brief of plaintiff's counsel (no written reasons for judgment are in the record), that plaintiff was contributorily negligent and therefore could not recover. This appeal followed.

For sometime prior to February 13, 1945, the record discloses, plaintiff and her infant daughter lived in the residence in question which was situated on a large tract of ground in a rural section of Webster Parish. Having contracted to sell the property, and in order to give possession thereof to the purchaser, she arranged with defendant to effect a removal from the premises of most of her furnishings and household goods and to store them in its warehouse. Pursuant to the arrangement defendant sent three of its employees (all colored), together with two trucks, to the property on the mentioned date, two of the men arriving there early in the morning and the other about noon. Since some of the furnishings had been sold along with the house, and were to remain, it was necessary for plaintiff to point out to defendant's employees from time to time (and she did) the various items that were to be packed for storage and removed. In keeping with their usual practice the men proceeded first to handle principally the articles in the bedrooms and living room, leaving for final removal the heavy equipment in the kitchen.

Late in the afternoon of the same day (about five o'clock), after most of the movables had been carried from the house and placed in the trucks, attention was directed to the kitchen furnishings, including a large cooking range designed to burn butane gas. This range, as well as numerous heaters throughout the dwelling (in-cluding two hot water heaters), was connected with a main supply line that led to two separate tanks of butane gas (one larger than the other) located some distance from the house and almost wholly buried, the smaller being within the enclosed rear yard and the larger outside or beyond a plank fence. There was no master valve on the main supply line by which the flow of gas from both tanks could be stopped; instead, each tank was fitted with a separate cut-off valve.

Preparatory to the disconnecting of the kitchen range and its removal, two of the men and the plaintiff went together outside and closed the valve on the smaller tank. They failed, however, to take the same precaution as to the larger tank. According to plaintiff the reason for the failure was that they could not find the larger tank's cut-off valve; the workmen, on the other hand, testified that they did not know of the existence of a second tank.

Be that as it may all parties, on their return to the kitchen, were fully aware that the flow of gas into the main supply line and to the range had not been stopped. Notwithstanding this knowledge the workmen, with the encouragement and approval of plaintiff, set about to remove from the rigid supply line the range's flexible copper connection and to substitute therefor one of two caps which plaintiff had given them prior to her going into a bedroom. During this operation, following the dis-

connection and while the substituting was being attempted, escaping gas became ignited, resulting in the throwing of a large flame up and along the kitchen wall and the setting fire to the dwelling. All efforts to extinguish the blaze with a garden hose were without avail. While the house was burning, however, a few additional articles of furniture and some of plaintiff's personal effects were removed. Also, the nearly loaded trucks and plaintiff's station wagon were driven to a place of safety.

That which ignited the gas, the evidence preponderately shows, was the pilot light of a hot water heater located in the kitchen only five and one-half feet from the disconnected line. All three of defendant's workmen testified positively to this fact. They stated that the blaze started at the hot water heater and traveled suddenly to the uncapped pipe. And corroborative of their testimony is the proven circumstance that butane gas escaping in a room, being much heavier than air, has a tendency to settle to and remain along the floor, near which the pilot light of a hot water heater is located. Moreover, no other cause for the ignition is indicated or even suggested by the record.

True, plaintiff testified that she extinguished the pilot light at least an hour before the disconnecting of the stove began (defendant's employees stated that she sought to do so immediately prior to their commencing); but, without impugning her good intention, we are satisfied that she is mistaken as to that accomplishment. Her testimony is that in extinguishing the pilot light (as well as the main burner) she used a cut-off located on the supply pipe between the bottom of the heater and the floor; the fact is, however, that there was no cut-off there. An examination of the heater, made by a butane installation expert following the fire, disclosed that the only cut-off it had was attached to the side about twelve inches above its bottom and eighteen inches from the floor. This expert explained that the cut-off was of disc type; that when turned part way the main burner was closed; and when fully turned the pilot light was also shut off. What plaintiff did, obviously, was to turn the disc type cut-off only part way, thereby closing the main burner but leaving the pilot lighted. And we might add that her confusion as to the location of the cut-off is easily understandable, for another hot water heater in the bathroom of her dwelling, according to the record, had a cut-off located as stated by her.

To our minds defendant's employees, as charged by plaintiff, were careless and negligent in their operation respecting the removal of the kitchen range, for at the time they were fully aware that the gas supply to the various units in the house, including those in the kitchen, was not shut off; and it is common knowledge that the disconnecting of a gas stove under those circumstances (especially one using butane gas which is more inflammable than

natural gas) is a hazardous undertaking. This is so even when the windows of the room have been raised and all fires in the several stoves of the house extinguished. Furthermore, the negligence of those employees is not excused by the fact (testified to by them but denied by plaintiff) that plaintiff insisted on the range's removal when they objected. There was nothing to prevent their refusal to perform.

This brings us to a consideration of the alternative special defense of contributory negligence on the part of plaintiff, with the trial court's sustaining of which we can not disagree. The testimony of plaintiff shows clearly that she was an active participant in the dangerous operation undertaken by defendant's employees, and that her efforts aided in causing the fire and its resulting damage.

■ In the first place plaintiff encouraged, if not suggested, the procedure resorted to. Thus, after the futile attempt outside the house to shut off the supply of gas, the following, to quote from her testimony, took place:

"We went back in the kitchen. I said, 'Well, we can't get it cut off at the tank'. They didn't know where the cut-off was and neither did I.

"I said, 'People do disconnect by just disconnecting the stove and capping the pipe.' I asked them if they had ever done that.

"They said, 'Yes ma'am,' they had done it.

"I had a tool box with miscellaneous tools, and I had two caps, one one size and one another. They were two different sizes. I handed them to the boy, the two caps. I said, 'Here are the caps, if you are sure you can do it that way, but be sure you raise all the windows and don't let anybody come near with a cigarette or light a match."

Her encouragement of the men is further indicated by this testimony which she gave:

"Q. Did you tell them to get the job finished?

"A. I don't remember telling them to get the job finished. About, late in the evening, taking down the stove, I said, 'Let's hurry up.' We lost two hours in the middle of day. 'We ought to get it done before dark.' I never did like to drive after dark. Except for hurrying them at the end of the job, I don't remember getting after them, correcting them, or directing them."

The reason for plaintiff's eagnerness to obtain an early completion of the work, she explained, was that she planned to drive to Shreveport that afternoon and wanted to arrive there before dark.

It is the testimony of defendant's employees that plaintiff not only insisted on the removal of the stove while the gas was on (to which they objected), but also that she assumed full responsibility for any injurious results. When first interrogated

during the trial about this claimed assumption she answered:

"Q. Did you also further [state] and in the same sentence and statement, 'also turn out all fires in the house, and I will be responsible if anything happens'? A. No. I don't remember stating any such thing.

"Q. Could you have? A. I don't know. I might have. I don't remember such a thing.

"Q. Would it have been possible you stated that? A. No. If I had been afraid I would never have let them remove it.

"Q. Not what your reasoning is Mrs. Ford. Did you make that statement? A. I don't remember making the statement." (Brackets ours.)

Later, on being further questioned when a witness on rebuttal, she testified: "No, I did not say I would assume full responsibility because that did not come into the question."

With further reference to the matter of responsibility for the unfortunate occurrence, however, plaintiff made the following admission:

"Q. You have stated you told these negro boys you didn't consider it their fault the fire started? A. Yes, I did."

The referred to statement, it appears, occurred during or immediately after the fire and while one of defendant's men was being treated for burns he had received.

Continuing her testimony, she explained it as follows:

"Q. What did you mean by that? A. I told them I was sorry. It wasn't their fault. They could not help it.

"Q. Why couldn't they help it? A. They could not help it if they were not capable of turning it off without hurting themselves. They were hurt. Everything else was hurt. It was just as a child could not have helped it if it made the same mistake.

"Q. They just didn't know any better? A. Just didn't know. They were doing the best they could. I didn't censor them personally."

This explanation, of course, did not accompany the statement. It may be that plaintiff, when it was made, did possess the considerate and sympathetic feeling for the men that she described. But if so, we are compelled to observe, her feeling was vastly different from that which most persons under the same circumstance would have entertained. Confident that he is free of fault, in a trying situation such as the one under consideration, the average person would not absolve another of blame if he thought that it rightfully belonged there.

Nevertheless, whether plaintiff assumed the risk of the dangerous undertaking or unqualifiedly admitted her fault for its disastrous results, the evidence otherwise, in our opinion, is sufficient to sustain the

conclusion of the trial judge that she was guilty of negligence which contributed to the destruction of the house and its contents. Especially do we refer to that which shows her encouragement of the men to proceed in the described hazardous manner and also her failure to turn off the hot water heater's pilot light (a task that she undertook to perform), which failure was a proximate and an efficient cause of the fire.

The several incidental contentions made by plaintiff's counsel herein are, we think, without merit. One of these is that the doctrine of res ipsa loquitur should be applied. This doctrine merely furnishes a rule of evidence, and it can have no application where, as in this case, a plaintiff is shown to be contributorily negligent in the operation of the offending instrumentality. Plunkett et ux. v. United Electric Service, 214 La. 145, 146, 36 So.2d 704.

Again, it is urged that defendant was engaged in the capacity of an independent contractor. The record does not support this position. Defendant received no list of specific articles to be moved and stored; neither did it contract to handle without interference from plaintiff the entire contents of her dwelling. Rather, its men, on their arrival at the scene, were under the direction and control of plaintiff as to the articles to be transported and those to remain. This right of control possessed by plaintiff is inconsistent with the idea of an independent contract.

Finally the argument is made that defendant must be deemed a common carrier, responsible as an insurer. The liability of a common carrier as an insurer of goods entrusted to it for transportation attaches only upon its receiving complete control of them. 9 American Jurisprudence verbo Carriers, Section 667. Certainly it was not intended that the destroyed house should be transported. As to the household goods and furnishings which were burned, the record does not disclose that defendant had ever received complete control of them. In fact under the arrangement between the parties plaintiff had the right to prevent their removal at any time.

The judgment is affirmed.